**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>TRANSDEV NORTH AMERICA, INC., *and* TRANSDEV SERVICES, INC.,<br><br>*Defendants*. | Case No. 1:19-cv-11503-LTS |

**CONSENT DECREE**

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") commenced this citizen's suit on July 9, 2019 against Transdev North America, Inc. ("Transdev NA") and Transdev Services, Inc. ("Transdev Services") (collectively, "Defendants");

WHEREAS, CLF is a regional, non-profit environmental organization;

WHEREAS, Defendants are transportation companies operating in North America;

WHEREAS, Transdev Services operates school buses owned by the Boston Public Schools ("BPS") within the Commonwealth of Massachusetts, pursuant to a contract with BPS;

WHEREAS, Plaintiff alleges in its complaint that Defendants idle BPS school buses in violation of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA" or "Act") and the Massachusetts motor vehicle idling requirements contained within the federally enforceable Massachusetts State Implementation Plan ("SIP"), 310 C.M.R. § 7.11(1)(b);

1

WHEREAS, Defendants deny liability for the allegations set forth in the Complaint, and nothing herein shall constitute an admission of liability or an admission that the Massachusetts idling regulations, 310 C.M.R. § 7.11(1)(b), are federally enforceable;

WHEREAS, Plaintiff and Defendants (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length, and agree that the settlement of the above-captioned action (the "Action") through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance public health and the environment by improving air quality in Massachusetts;

WHEREAS, the Plaintiff and Defendants each consent to the entry of this Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the forty-five (45) day review period mandated by the CAA;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission by either Party of any issue of fact or law, except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

2. Venue properly lies in this Court and district pursuant to 42 U.S.C. § 7604(c)(1)

and 28 U.S.C. § 1391(b), because the Complaint alleges violations to have occurred in this district, and the Defendants conduct business in this district.

3.   Plaintiff gave Defendants notice of the violations alleged in this Complaint more than sixty (60) days prior to commencement of this lawsuit by a letter (the "Notice Letter"). Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Regional Administrator of the EPA for Region 1, the Massachusetts Environmental Department ("MassDEP") Commissioner, and the EPA Citizen Suit Coordinator.

4.   Solely for purposes of this Consent Decree and the underlying Complaint, and any action to enforce this Consent Decree, Defendants consent to this Court's jurisdiction and to venue in this judicial district. Defendants consent to and shall not challenge entry of this Consent Decree, or this Court's jurisdiction to enter and enforce this Consent Decree. Except as expressly provided for herein, this Consent Decree shall not directly create any rights in or obligations of any party other than the Parties to this Consent Decree.

5.   This Court shall retain jurisdiction over this case until termination of the Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XI (Dispute Resolution) and XV (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II.  APPLICABILITY

6.   Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, Plaintiff and Defendants, and any successors, assigns, or other entities or persons otherwise bound by law.

7.   In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, or agents to take any actions

necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

8. Terms used in this Consent Decree that are defined in the Act or in regulations promulgated by EPA and MassDEP pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree. All references to a duration of "days" shall be calendar days unless otherwise specified. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a. "Air Pollution Mitigation Projects": Projects that will reduce air pollution and improve the environment in Boston, particularly in the neighborhoods where Transdev Services operates BPS-owned bus lots. These projects will be implemented pursuant to the terms provided in Exhibit A.

b. "Boston Public Schools" or "BPS": Public school district in Massachusetts.

c. "Implementing Organization": Each of the third-party entities implementing the Air Pollution Mitigation Projects described in Exhibit A of this Consent Decree.

d. "Independent Auditor": A mutually selected independent third party, retained pursuant to the Independent Auditor Agreement.

e. "Independent Auditor Agreement": Enforceable private contract between the Parties and the Independent Auditor governing the retention, duties, reporting, and payment of the Independent Auditor.

f. "National Locations": All non-BPS active bus service locations of Transdev Services in the United States at which Transdev Services is responsible for the actual operation of buses to transport passengers, and excluding call centers,

administrative operations or locations, maintenance-only facilities, and other locations where Transdev Services performs administrative or support functions (as opposed to the transport of passengers); National Locations shall further include any new locations where operations are initiated during the Term of the Consent Decree, and shall exclude any locations that cease operations during the Term of the Consent Decree, in each case as of the date such location or facility begins or ceases operation.

## IV. LOCAL TRAINING & SIGNAGE COMPLIANCE MEASURES

9. Vehicles operated by Transdev Services in Massachusetts shall comply with the Massachusetts idling regulation, 310 CMR 7.11(1)(b).

10. Transdev Services shall include language regarding Massachusetts idling requirements (as described in 310 CMR 7.11(1)(b)) in operator and driver handbooks for Transdev Services' BPS operations, as well as an explanation of the negative health effects of idling and vehicle exhaust. Transdev Services shall include information in additional languages as appropriate.

11. Transdev Services shall require annual training of all of the BPS vehicle operators employed by Transdev Services regarding (i) applicable Massachusetts idling regulations and (ii) the negative health effects of idling. The training will focus on eliminating unnecessary idling, including during pre- and post-trip inspections. The annual training shall typically occur between June and August in each calendar year during the Term of the Consent Decree. Transdev Services will provide the annual training materials in additional languages as appropriate. Training may be delayed due to operational constraints related to the COVID-19

pandemic, but will occur as soon as reasonably practical depending on such operational restraints.

12. All new operators shall receive anti-idling training within sixty (60) days of hiring. New operator training may be conducted virtually or in person.

13. Transdev Services will include anti-idling content in each monthly training provided to all BPS vehicle operators employed by Transdev Services. Transdev Services will provide training materials, if any, in additional languages as appropriate. Monthly training may be conducted virtually or in person.

14. Transdev Services will include at least one anti-idling message per week during which BPS buses are operating, to be delivered during safety briefings or other driver communications.

15. Transdev Services will post and maintain the following signage at BPS facilities:

a. Clearly visible "No Idling" signs at BPS bus yards operated by Transdev Services at each bus yard exit gate and at other appropriate locations within the bus yard and interior areas.

b. Clearly visible "No Idling" stickers on the dashboard of each BPS bus operated by Transdev Services unless a technical or safety issue prevents such placement, in which case Transdev Services shall include other anti-idling information elsewhere within the bus visible to the operator. Transdev Services will include such information in additional languages if feasible and appropriate.

c. Transdev Services shall identify BPS buses undergoing diesel exhaust system regeneration with a sign placed in the window of such buses. The sign shall be

no smaller than 18 by 24 inches and clearly state: "This bus is undergoing diesel exhaust system regeneration."

### V. LOCAL IDLING REDUCTION MEASURES

16.  Transdev Services shall designate one or more employee(s) on or around each shift (defined as the approximate 2-hour window of activity in the morning and afternoon) for each BPS bus yard operated by Transdev Services who will be in charge of monitoring idling at their assigned bus yard.

    a.  The designated employee(s) shall conduct unannounced walkthroughs of their assigned bus yard(s) during school days when buses are starting up and shutting down.

    b.  The designated employee(s) shall instruct drivers who are engaged in Excess Idling, as defined in the Independent Auditor Agreement, to stop.

    c.  In cases where a driver is absent from the bus, the designated employee(s) shall shut off buses found idling without a clear need for such idling (such as maintenance).

    d.  Designated employees at the Readville and Freeport BPS bus yards will be provided with electric golf carts to ensure rapid and more frequent bus yard coverage (no golf carts will be required at the Washington Street bus yard).

    e.  Designated employees will identify and document drivers with three or more idling instances within a one week period and work with those drivers to deliver real-time assistance and counseling on idling compliance.

17.  Transdev Services shall designate one or more employee(s) ("Field Supervisors") who will conduct monitoring of idling of buses on the roads and at additional sites, including

schools (the "Field Check Program"). Field Supervisors shall conduct checks of buses in these locations and shall check a number of BPS buses each month that is equal to or greater than the number of BPS School Days that month. During these checks, the Field Supervisor shall (i) identify impermissible idling, (ii) provide drivers with anti-idling training or information in the field, as appropriate, and (iii) document their review. The Field Check Program shall be in addition to the Field Supervisors' other duties. For purposes of calculating the required number of monthly checks, "BPS School Days" shall include only those days when (i) regular or summer school is physically in session at BPS school facilities and (ii) at least twenty percent of BPS school buses operated by Transdev Services are in-service on that same day.

18. The Parties shall mutually select an Independent Auditor to observe BPS bus yards and provide reports to the Parties as set forth in the Independent Auditor Agreement. The Independent Auditor shall conduct up to twenty (20) audits during the Term of this Decree. The Independent Auditor shall conduct no more than six (6) audits during any given calendar year (pro-rated for any partial years).

### VI. NATIONAL TRAINING & SIGNAGE COMPLIANCE MEASURES

19. Transdev Services shall deliver anti-idling educational materials to all bus operators employed by Transdev Services at the National Locations. Educational materials shall be delivered as a pamphlet, driver handbook insert, or online training module (as determined by Transdev Services) and shall include, at a minimum, content regarding any applicable state idling regulations and an explanation of the negative health effects of idling and vehicle exhaust. Where appropriate, Transdev Services will include such anti-idling information in additional languages.

20.  Transdev Services shall post clearly visible "No Idling" signs at transportation yards that are operated by Transdev Services at the National Locations.

## VII.  RECORDKEEPING AND REPORTING

21.  On or before January 30th and July 30th of each calendar year following the Effective Date, and until termination of this Consent Decree pursuant to Section XIV (Effective Date & Termination), Transdev Services shall submit a semi-annual report to CLF for the immediately preceding six-month period that describes Defendants' implementation of the measures contained in Paragraphs 9-20 (Local Training & Signage Measures,  Local Idling Reduction Measures, and National Training & Signage Compliance Measures).

22.  For the duration of the Consent Decree, and until ninety (90) days after termination of this Consent Decree pursuant to Section XIV (Effective Date & Termination), Transdev Services shall retain at least six months of the following data (collectively the "Retained Data"):

    a.   The number of drivers receiving anti-idling training (during monthly trainings) pursuant to Paragraph 13;

    b.   The number of drivers receiving idling counseling through the BPS idling reduction program described in Paragraph 16(e); and

    c.   The number of drivers receiving idling checks and counseling through the Field Check Program set forth in Paragraph 17.

23. Plaintiff may request at any time that Transdev Services share the Retained Data. Plaintiff may only make one such request per calendar quarter, and each request may only extend to the immediately preceding three months of Retained Data. Upon receipt of such a request,

Transdev Services shall provide the requested Retained Data to Plaintiff within fifteen (15) business days.

## VIII.  PAYMENTS

24.  Within thirty (30) days after the Effective Date, Defendants shall pay to the United States Department of Treasury a civil penalty of $15,000 U.S. dollars. Failure to timely pay the civil penalty shall subject Defendant to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Defendant liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

25. Defendants shall pay a total of $800,000 U.S. dollars to fund Air Pollution Mitigation Projects pursuant to the terms provided in Exhibit A. The $800,000 shall be distributed to the following recipients on the following schedule:

    a.  One payment of $150,000 paid to Speak for the Trees, on or before December 31, 2020.

    b.  One payment of $150,000 paid to HEET, on or before December 31, 2020.

    c.  One payment of $100,000 paid to Alternatives for Community & Environment, on or before December 31, 2020.

    d.  One payment of $150,000 paid to Speak for the Trees, on or before December 31, 2021.

    e.  One payment of $150,000 paid to HEET, on or before December 31, 2021.

    f.  One payment of $100,000 paid to Alternatives for Community & Environment, on or before December 31, 2021.

26.  Consistent with 42 U.S.C. § 7604(d), within thirty (30) days of the Effective Date, Defendants shall pay $110,000 U.S. dollars by company check to Plaintiff, which shall resolve all claims for attorneys' fees, costs, or other expenses.

27.  Defendants shall not deduct any penalties paid under this Section or Section IX (Stipulated Payments) in calculating its federal or state or local income tax.

28.  Any public statement made by Defendants in any press release or written material promoting Defendants' environmental or charitable practices or record, or in Defendants' Annual Reports, that refers to Defendants' payments under this Section or Section IX (Stipulated Payments) shall include the language materially similar to the following: "Payments to the organizations were made pursuant to the settlement of a Clean Air Act lawsuit brought by Conservation Law Foundation." Each Party shall be offered a reasonable opportunity to review any press release, article, and website update (excluding social media posts) issued by a Party and related to the lawsuit or this Consent Decree, as early as practicable prior to its release.

## IX.  STIPULATED PAYMENTS

29.  Defendants shall be liable for stipulated payments for each occurrence of Excess Idling as recorded and demonstrated by the Independent Auditor, in accordance with terms mutually agreed upon by the Parties in the Independent Auditor Agreement.

30.  The accrual, payment, and dispute of stipulated payments for Excess Idling shall be solely governed by Paragraphs 29-33 and 36-37, the dispute resolution procedures set forth below in Section XI, and the Independent Auditor Agreement.

31.  The stipulated payments for Excess Idling are as follows:

11

| Excess Idling Time | Stipulated Payment Amount |
|---|---|
| 1-10 minutes | $500 |
| 11-20 minutes | $750 |
| 21-40 minutes | $2,000 |
| 41-60 minutes | $3,000 |
| 61+ minutes | $6,000 |

32. If Defendants do not invoke the dispute resolution mechanism described in Section XI, Defendants shall pay stipulated payments for Excess Idling to the Implementing Organizations within thirty (30) business days of receipt of the Independent Auditor's report, unless CLF elects to waive such stipulated payments.

33. In the event that Defendants invoke the dispute resolution mechanism described in Section XI, and the Arbitrator affirms any Excess Idling event, Defendants shall pay any related stipulated payments to the Implementing Organizations in accordance with the provisions of Section XI. If the Arbitrator does not affirm any Excess Idling event, Defendants are not liable for any stipulated payments related to that event.

34. Defendants also shall be liable for stipulated payments not related to Excess Idling, as follows:

| Violation | Stipulated Payment Amount |
|---|---|
| Failure to install or maintain signs at BPS bus yard exit gates (as required by Paragraph 15) | $500 per month |
| Failure to perform bus yard walkthrough (as required by Paragraph 16) | $500 per month |
| Failure to conduct specified field checks (as required by Paragraph 17) | $1,000 per month |

12

| Failure to meet annual driver training requirement (as required by Paragraph 11) | $100 per driver |
|---|---|
| Failure to retain documentation (as required by Section VII, Recordkeeping and Reporting) | $1,000 per request |
| Failure to provide information to CLF upon request (as required by Section VII, Recordkeeping and Reporting) | $1,000 per request |
| Failure to provide semi-annual reports (as required by Paragraph 21) | $1,500 per week of delay |

35.  All accrued stipulated payments for the violations listed in Paragraph 34 payable under this Consent Decree shall be paid to the Implementing Organizations within thirty (30) business days of the last day of each calendar quarter.

36.  All stipulated payments (whether accruing under Paragraph 31, for Excess Idling, or Paragraph 34, for other violations) shall be distributed to the Implementing Organizations on an equal basis. For example, and by way of example only, if stipulated payments of $3,000 are due, Defendants shall pay $1,000 to each of the Implementing Organizations.

37.  CLF may, in its sole discretion, waive stipulated payments if it determines that Transdev Services is working in good faith to resolve the issue in a timely fashion, or for any other reason.

## X.  FORCE MAJEURE

38.  "Force Majeure" is defined as any event arising from causes beyond the control of Defendants, their contractors, or any entity controlled by Defendants that causes a delay or impediment to performance in complying with any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. Force Majeure events shall include, but are not

limited to: war or violent uprising, natural disasters, labor strikes, transport delays, civil unrest, a declared state of emergency, and public health concerns (which shall include without limitation the COVID-19 pandemic). The requirement that Defendants exercise best efforts to fulfill the obligation includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay or non-performance during such event to the greatest extent possible. Force Majeure does not include Defendants' financial inability to perform any obligation under this Consent Decree. Unanticipated or increased costs or expenses associated with the performance of Defendants' obligations under this Consent Decree shall not constitute circumstances beyond Defendants' control, nor serve as the basis for an extension of time under this Section, and shall not constitute an event of Force Majeure.

39. If any event occurs or has occurred that may delay or prevent compliance with the performance of any obligation under this Consent Decree, as to which Defendants intend to assert a claim as an event of Force Majeure, Defendants shall provide written notice to CLF of such claim, in accordance with Section XIII, as soon as practicable but no later than thirty (30) days following the date Defendants first knew that the claimed Force Majeure event may cause such delay or impediment and give rise to a claim of Force Majeure. Upon providing notice of Force Majeure, Defendants' time for performance of the obligations under this Consent Decree that are affected by the Force Majeure will be extended as necessary to complete those obligations, or the obligations will be eliminated if performance is no longer possible.

## XI. DISPUTE RESOLUTION

40. All disputes related to the stipulated payments for Excess Idling shall be subject to the binding dispute resolution process as described herein.

41.  Within thirty (30) days of the Effective Date, the Parties shall mutually select a neutral third party to make a binding determination during any dispute resolution process related to Excess Idling (the "Arbitrator").

42.  Each Party has the right to dispute a determination made by the Independent Arbitrator with respect to Excess Idling, except that Plaintiff is limited to initiating five (5) such disputes during the Term of this Consent Decree; no numeric limit applies to the number of disputes initiated by Defendants. If a Party disputes any determination made by the Independent Auditor with respect to Excess Idling, or the applicability of stipulated payments to any event or claim of Excess Idling (the "Disputing Party"), then that Party has the right to initiate the following process with the other Party (the "Non-Disputing Party"):

    a.  The Disputing Party has seven (7) days after receipt of any report by the Independent Auditor to inform the Non-Disputing Party that it will be disputing one or more instances of idling designated as Excess Idling by the Independent Auditor's report.

    b.  The Disputing Party has twenty-one (21) days after receipt of the Independent Auditor's report to investigate and provide to the Non-Disputing Party any documentation indicating that the disputed idling event(s) was not Excess Idling.

    c.  The Non-Disputing Party shall review the documentation provided by the Disputing Party and respond within twenty-one (21) days. Such response shall indicate whether the Non-Disputing Party agrees with the Disputing Party's assessment of the disputed idling event.

d. If the Parties remain in disagreement regarding Excess Idling event(s) following the Non-Disputing Party's response, either Party has the right appeal to the Arbitrator within ten (10) days of the Non-Disputing Party's response.

e. Each Party has the right (but is not required) to submit a statement, not to exceed two pages per idling event, to the Arbitrator within fifteen (15) days of any such appeal.

f. The Arbitrator shall review:

    i. Each Party's statement, if any;

    ii. The report of the Independent Auditor and any related documents or information provided by the Independent Auditor; and

    iii. The documentation previously submitted to Plaintiff by Defendants.

43. The Arbitrator shall issue a written, binding, and non-appealable determination simultaneously to both Parties as to whether the disputed instance(s) do or do not constitute Excess Idling.

44. The non-prevailing Party of any dispute resolution process shall pay all costs related to the Arbitrator for that given dispute. If a Party partially prevails, the other Party shall pay costs on a pro-rated basis. For example (and by way of example only), if a Party appeals three Excess Idling events and prevails on two of those events, the non-prevailing Party would pay 2/3 of the costs related to the Arbitrator with remaining costs borne by the non-prevailing Party. Similarly, for example (and by way of example only), if Party A appeals three Excess Idling events and Party B appeals two Excess Idling events, all related to the same Independent Auditor report, and both Parties prevail in all of their appeals, Party B would pay 3/5 of the costs related to the Arbitrator while Party A would pay 2/5 of those costs. Each Party shall bear its

16

own legal fees and internal costs related to the dispute resolution processes described in this Section XI.

45. Stipulated payments for Excess Idling events affirmed by the Arbitrator shall be payable by Defendants within thirty (30) days of the issuance of the Arbitrator's written determination with respect to the applicable Excess Idling events.

## XII. EFFECT OF SETTLEMENT

46. Entry of this Consent Decree shall resolve any and all claims, causes of action, or liability arising under the CAA and Massachusetts state law brought by the Plaintiff against the Defendants for damages, penalties, fines, injunctive relief, past and future attorney's fees, past and future costs, or any other claim or relief relating to the violations that were alleged, or could have been alleged, in the Complaint or in this action; Plaintiff covenants not to sue, releases, and forever discharges Defendants from all such claims, causes of action, or liabilities arising on or before the Effective Date.

47. CLF covenants not to sue and shall not bring any claim, cause of action, or suit against Defendants for any alleged violations of the same nature or type as those described in the Complaint that occur prior to the Termination Date; Plaintiff's exclusive remedy and recourse for any such claims against Defendants, or other claims related to Excess Idling of BPS buses or alleged violations of Massachusetts idling laws or regulations arising after the Effective Date and prior to the Termination Date, shall be through the Independent Auditor and the stipulated

payments described in this Consent Decree for Excess Idling, subject to the outcome of any dispute resolution process.

48.  This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.  NOTICES

49.  Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
hgovern@clf.org

For Defendants:
Ted Koerth
Transdev North America, Inc.
720 East Butterfield Road
Suite 300
Lombard, IL 60148
ted.koerth@transdev.com

Brook Detterman
Beveridge & Diamond, PC
155 Federal Street
Suite 1600
Boston, MA 02110
bdetterman@bdlaw.com

David Friedland
Beveridge & Diamond, PC
1350 I St. NW
Suite 700
Washington, DC 20005
dfriedland@bdlaw.com

50. Any Party may, by written notice to the other Party, change its designated notice recipient, address or means of transmittal provided above.

51. All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail if practicable, but if not practicable, then by overnight mail or overnight delivery service. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XIV. EFFECTIVE DATE & TERMINATION

52. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket. All obligations arising under this Consent Decree shall become effective as of the Effective Date, except that in the event that the Effective Date is less than forty-five (45) after this Consent Decree is first filed with the Court, then such obligations shall become effective forty-five (45) days after the Effective Date.

53. The Parties shall enter into the Independent Auditor Agreement after the Effective Date. Any disputes concerning the Independent Auditor and any reports issued by the Independent Auditor shall be resolved pursuant to Section XI (Dispute Resolution) of this Consent Decree.

54. The Consent Decree shall terminate five years after the Effective Date, or upon termination of Transdev Service's contract with BPS, whichever comes first (the "Termination Date"). The Term of this Consent Decree begins on the Effective Date and ends on the Termination Date.

### XV.  MODIFICATION

55.  The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

56.  Any disputes concerning this Consent Decree shall be resolved by the Court, except for disputes related to the stipulated payments for Excess Idling, which shall be resolved exclusively pursuant to Section XI (Dispute Resolution) of this Consent Decree.

### XVI.  SIGNATORIES/SERVICE

57.  Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

### XVII.  INTEGRATION

58.  This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

### XVIII.  FINAL JUDGMENT

59.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and Defendants.

# SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____ Date: 10/23/20 _____

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**Transdev North America, Inc.**

By: _____ Date: 10/23/2020 _____

Jennifer Coyne
Transdev North America, Inc.
720 East Butterfield Road
Suite 300
Lombard, IL 60148

**Transdev Services, Inc.**

By: _____ Date: 10/23/2020 _____

Jennifer Coyne
Transdev North America, Inc.
720 East Butterfield Road
Suite 300
Lombard, IL 60148

Dated and entered this 1   8th Day of December , 2020 _____ .

_/s/ Leo T. Sorokin_____
United States District Court Judge

October 26, 2020                          *Respectfully submitted*,

                                          TRANSDEV NORTH AMERICA, INC.,
                                          TRANSDEV SERVICES, INC.

                                          By their Attorney,

                                          */s/ Brook Detterman*

                                          Brook Detterman, Esq., BBO No. 675396
                                          BEVERIDGE & DIAMOND, P.C.
                                          151 Federal Street, Suite 1600
                                          Boston, MA  02110
                                          (617) 419-2300
                                          bdetterman@bdlaw.com

                                          CONSERVATION LAW FOUNDATION,
                                          INC.

                                          By its Attorney:
                                          */s/ Heather A. Govern*
                                          Heather A. Govern, Esq., BBO No. 688482
                                          Conservation Law Foundation
                                          62 Summer Street
                                          Boston, MA 02110
                                          (617) 350-0990
                                          hgovern@clf.org

22

**EXHIBIT A**

**<u>Air Pollution Mitigation Projects</u>**

In addition to the requirements in Paragraph 25 of the Consent Decree, the Parties agree to comply with the following requirements to ensure that the intended benefits of the $800,000 payment (the "Project Funds") by Defendants for the Air Pollution Mitigation Projects ("Mitigation Projects") described below are achieved. Each Mitigation Project is designed to reduce air pollution and improve air quality and the environment for individuals living and working near BPS bus yards.

## I. PROJECT FUNDS RECIPIENTS

The Parties have designated Speak for the Trees, HEET, and Alternatives for Community & Environment (each an "Implementing Organization") as the third-party recipients to receive the Project Funds and implement the Mitigation Projects described below. No later than ten (10) days after the date of entry of the Consent Decree by the Court, Plaintiff agrees to obtain from each Implementing Organization and provide to Defendants written confirmation that each Implementing Organization: (1) has legal authority to accept funding for the Mitigation Projects; (2) has the legal authority and capability to conduct the Mitigation Projects; and (3) will comply with the requirements of this Exhibit A regarding expenditure of the Project Funds and implementation of the Mitigation Projects. Plaintiff further agrees, no later than thirty (30) days after the date of entry of the Consent Decree by the Court, to obtain from each Implementing Organization relevant payment details and any related information (such as an organization's tax identification number) required by Defendants in order to facilitate payment of Project Funds to each Implementing Organization.

EX-1

## II.   MITIGATION PROJECTS

### A.   Mitigation Project 1: Tree Planting

1. Implementing Organization: Speak for the Trees

2. Project Funds: $300,000

3. Description. This Mitigation Project will include the following components:

- Speak for the Trees will facilitate street tree planting on public land near bus lots (parks, sidewalks, etc.). Plantings will include watering and warranty, with a minimum of 30 trees planted in the affected neighborhoods.

- Speak for the Trees will host three community tree giveaway events. At each event, Speak for the Trees staff will educate private landowners in the affected neighborhoods regarding tree care and will provide trees to be planted on the landowners' property, with a goal of giving away 250 trees at each event.

- Speak for the Trees will use remaining funding to further advocacy, outreach, and education regarding tree inventories and additional street tree planting activities.

4. Projected Air Quality Benefits: Trees planted through this Mitigation Project will remove carbon dioxide and improve air quality. Roadside trees reduce nearby indoor air pollution by more than 50%. Tree planting also will increasing the resilience of neighborhoods, reduce the rate of heat-related illnesses, and reduce energy costs associated with cooling.

### B.   Mitigation Project 2: Residential Energy Efficiency Improvement

1. Implementing Organization: HEET

2. Project Funds: $300,000

EX-2

3. <u>Description</u>: HEET will conduct assessments of electric capacity in the targeted communities and, to the extent feasible and aiming for the highest impact, reduce emissions and energy bills as preparation to transitioning homes to electricity and away from the use of fossil fuel. Specific project goals include:

- Assess electrification capacity for 100+ homes.

- Ensure low-income households are signed up for a 30% utility-provided discount rate on both gas and electric bills. Outreach to 200+ households with the aim of signing up ~50 households.

- Support 100+ energy assessments (low income & market rate homes).

- Provide, facilitate, and /or install energy efficiency upgrades and technology in 100 to 200 homes, potentially including thermostats, insulation, heat pumps, and other energy efficiency tools.

- Organize at least 5 community education events around energy efficiency, emissions, and electrification.

4. <u>Projected Air Quality Benefits</u>: This Mitigation Project will directly reduce fossil fuel consumption and related emissions of nitrogen oxides, particulate matter, sulfur dioxide, and other pollutants similar to those emitted by BPS buses. This project also will provide additional benefits by assisting lower income areas in accessing the benefits of MassSave, the state's energy efficiency program, to maximize residential energy savings in affected areas.

## C. **Mitigation Project 3: Transit Subsidies**

1. <u>Implementing Organization</u>: Alternatives for Community & Environment ("ACE")

2. <u>Project Funds</u>: $200,000

EX-3

3. <u>Description</u>: ACE will implement a multi-year program to distribute subsidized MBTA passes, targeting public transportation riders that live in subsidized housing in the affected neighborhoods. ACE will hold community events (in person or virtual) inviting targeted community members to receive passes. This Mitigation Project has a goal of providing 4,000 discounted MBTA passes over 5 years.

4. <u>Projected Air Quality Benefits</u>: Reduce vehicle miles traveled by encouraging increased use of public transit. Reduced vehicle miles will result in reductions in air pollution, including reductions in nitrogen oxides, particulate matter, and sulfur dioxide.

## III.  GENERAL OBLIGATIONS AND REPORTING

A. <u>Use of Project Funds</u>. Each Implementing Organization shall receive and use Project Funds in accordance with the parameters described above, and exclusively for the purpose of implementing the Mitigation Projects. Implementing Organizations shall not use Project Funds for any other purpose including without limitation to initiate or support: (i) any legislative or lobbying efforts; (ii) any administrative petition, rulemaking activity or action; or (iii) any judicial litigation.

B. <u>Change in Projects.</u> The Parties may agree, in writing, to changes to the: (i) scope of any Mitigation Project; and (ii) the allocation of dollars among the specific Mitigation Projects, or to additional projects not specifically described in this Exhibit A that serve similar purposes as the defined Mitigation Projects by improving air quality. Such agreed changes do not require approval by the Court. If an Implementing Organization issues a public statement disparaging either Party, the Parties shall identify a substitute

organization to which to direct any remaining Project Funds originally designated for that Implementing Organization.

C. <u>Confirmation of Funding.</u> Within thirty (30) days of initial receipt of Project Funds by each Implementing Organization from Defendants, as provided by the Consent Decree and this Exhibit A, each Implementing Organization shall submit to the Parties, pursuant to the notice provisions in the Consent Decree, a letter documenting receipt of such Project Funds and attesting to the Implementing Organization's plans to use those funds in accordance with this Exhibit A.

D. <u>Annual Reports</u>. Each Implementing Organization will submit to the Parties, pursuant to the notice provision in the Consent Decree, annual status reports due on January 31st of each year while funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Mitigation Projects.

E. <u>Final Report.</u> Within ninety (90) days of the five-year anniversary of the date of entry of the Consent Decree by the Court, each Implementing Organization will submit to the Parties, pursuant to the notice provision in the Consent Decree, a final Completion Report. The report will contain at a minimum: (i) a detailed description of the Mitigation Projects as implemented; (ii) a full expense accounting including itemized costs; (iii) a certification and demonstration that the Mitigation Projects have been fully implemented pursuant to the provisions of the Consent Decree and this Exhibit A; (iv) a description of the environmental and public health benefits resulting from implementation of the Mitigation Projects; and (v) an accounting of any unspent Project Funds.

EX-5

F.   Unspent Funds. Any Project Funds that remain unspent as of five calendar years after the date of entry of the Consent Decree by the Court will be directed to community environmental projects in Boston that are similar to or serve similar purposes as the Mitigation Projects by improving air quality. In the event that unspent Project Funds exist, the Implementing Organization will submit to the Parties an accounting of such funds and a description of the intended use for such unspent Project Funds. Under no circumstances shall any of the unspent Project Funds be used to initiate or support (i) any legislative or lobbying efforts (ii) any administrative petition, rulemaking activity or action, or (iii) any judicial litigation.

4" = "4" "14166980v1  BDFIRM 018747" "" 14166980v1  BDFIRM 018747

EX-6